IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICROMETL CORP., <br> Plaintiff. | Case No.: 1:08-cv-0321-LJM-WTL |
| vs. | U.S. District Judge Larry J. McKinney |
| TRANZACT TECHNOLOGIES, INC., <br> Defendant. | Magistrate Judge William T. Lawrence |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS/TRANSFER FOR IMPROPER VENUE PURSUANT TO RULE 12(b)(3) AND/OR 28 U.C.S.A. § 1406**

Defendant, TRANZACT TECHNOLOGIES, INC. (hereinafter, "Defendant"), by and through its attorneys, SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY and SULLIVAN HINCKS & CONWAY, states as follows for its Reply in Support of its Motion to Dismiss/Transfer for Improper Venue.

**I.    Plaintiff's arguments are belied by the plain language of the parties' agreement.**

In response to Defendant's Motion to Dismiss/Transfer for Improper Venue, Plaintiff argues that "there is no evidence that the parties intended Defendant's website to become a part of the Contract" between the parties. That assertion, however, is clearly undermined by the plain language of the Contract – language that Plaintiff even cites earlier in its Response. Quite clearly, the Contract states:

> The principles for the Freedom Logistics that are a part of our service offerings are contained in their entirety in our FREEDOM LOGISTICS NETWORK 21ST CENTURY SHIPPER TRANSPORTATION SERVICES, which can be found at a secure link on our web site which we will provide to you before you partner with us. These written principles **are what govern both our commitments** and we want them readily available at all times so you can access them for your understanding and use…These services are subject to standard principles that are on the secure link on our web site. **These rules govern both of our commitments that arise from our signatures** implementing your membership in the FREEDOM LOGISTICS NETWORK.

(Ex. 3, "Exhibit A")[1] (emphasis added).

How Plaintiff can claim that there is "no evidence that the parties intended TransAct's website to become a part of the Contract" when the Contract itself specifically notes that the principles on the website "are what govern both our commitments" and "govern both of our commitments that arise from our signatures" defies logic. The Contract's language speaks for itself, and expresses a clear intention on the part of the parties to have the principles contained on the website "govern" their relationship.

Faced with such an obvious incorporation by reference in the Contract language itself, Plaintiff instead argues that the Contract could not express an intention to have the website principles govern the parties' relationship – despite a clearly stated intention to do so – because Plaintiff's signatory, Mark Webber, "was never informed…that additional terms and conditions of the Contract were contained on TranzAct's website." Of course, had Webber actually read the above-quoted language, he would have "been informed" that additional terms and conditions of the Contract were contained on TranzAct's website. It is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them. Paper Express, Ltd. v. Pfankuch Maschinen GmbH, 972 F.2d 753, 757 (7th Cir. 1992). Webber's own admitted failure or refusal to actually read the document he signed, along with its incorporated materials, does not and cannot invalidate the document itself. See, e.g., Paper Express, 972 F.2d at 757 (plaintiff's failure to read the rules referenced in the contract – rules containing the forum selection clause – because they were in "extremely fine print" and in German cannot preclude enforcement of the clause); Vaeda Industries, Inc. v. Jason, Inc., 2008 U.S. Dist. LEXIS 18991 (N.D. Ind. 2008) (plaintiff's ignorance of the forum selection clause,

---

[1] Unless otherwise noted, Defendant will reference the Exhibits attached to its original Motion to Dismiss/Transfer for Improper Venue, as referenced therein.

2

incorporated by reference in a purchase order, was due to plaintiff's own neglect in failing to request copy of terms and conditions; forum selection clause upheld).

Plaintiff cites no caselaw to support its assertion that Defendant's practice of making its boilerplate principles available via its website is "deceptive and fundamentally unfair." By contrast, several Seventh Circuit courts, applying both Illinois and Indiana law, have upheld forum selection clauses in similar factual situations. See, e.g., "HAB Carriers, Inc. v. Arrow Tuck Sales, Inc., 2007 U.S. Dist. LEXIS 62525 (N.D. Ill. Aug. 23, 2007) (described in detail in Defendant's Memorandum in Support of Motion to Dismiss/Transfer for Improper Venue)

In Vaeda, supra, the court upheld a forum selection clause that was contained in the defendant's "terms and conditions," even though the plaintiff in that case claimed to have never read the terms and conditions. The terms and condition were referenced on the defendant's purchase order with the following language: "Acceptance of purchase order is subject to Milsco Terms and Conditions (WI-MPR-007.3.) Request WI-MPR-007.3 if needed." The Vaeda court rejected the plaintiff's argument that the forum selection clause was unconscionable because the defendant never actually provided the referenced terms and conditions to the plaintiff. In doing so, the court found that the defendant knew of the existence of the terms of conditions, chose not to request a copy, and thus "chose to proceed at its own risk without knowing what was [it] was agreeing [to] contained in the Terms and Conditions." Id. at *6-7.

Here, as in Vaeda, the initial document presented to Plaintiff for its signature specifically references principles that "govern" the contractual relationship among the parties. At all times prior to and during its relationship with Defendant, Plaintiff had the opportunity to review those principles, one of which was the forum selection clause entitled "Controlling Law." The fact that Defendant chose not to carefully read the Contract, or further request the additional

materials incorporated into the Contract, does not exculpate Defendant from the legal effect of those materials. As with the Vaeda plaintiff, Plaintiff here "chose to proceed at its own risk" by not reviewing the standard principles contained on Defendant's website, and it cannot benefit now from its own neglect.

Finally, in International Star Registry of Ill. v. Omnipoint Marketing, Inc., 2006 U.S. Dist. LEXIS 68420 (N.D. Ill. 2006), the Northern District of Illinois addressed a very similar situation to the instant case. In that case, the defendant's invoices contained the following language: "By my signature below, I certify that I have read and agree to the provisions set forth in this invoice and to the terms and conditions posted at [web address], and that I am duly authorized to bind the following organization ("client") to such provisions." The "General Terms" contained on the defendant's website contained a forum selection clause. The court concluded that the language incorporating the additional terms and conditions "clearly expresses [defendant's] intent to be bound by the terms and conditions set forth on its web site and clearly states that by signing the invoice, the signee intends to be bound by the terms and conditions." Id. at *10. As such, the court enforced the forum selection clause contained on the defendant's website.

Here, Plaintiff intimates that without the specific language "incorporate by reference," no additional materials can ever be incorporated into a contract. Of course, there is no such "magic words" requirement to contract formation. See, PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc., 420 F.3d 728, 732 (7th Cir. 2005). The Contract in this case clearly references the principles on the Defendant's website, and clearly states the parties' intention that said principles will "govern" their agreement. When Mark Webber on behalf of Plaintiff signed the signature page, he was affirming those stated intentions. The fact that Webber never bothered to actually read

4

the principles that governed the agreement does not undermine the principles' validity; he did so at his own peril. Paper Express, 972 F.2d at 757 ("[A] party who agrees to terms in writing without understanding or investigating those terms does so at his own peril"). As in International Star, the language here clearly expresses an intent on the part of the parties to incorporate the website provisions by reference into the contract. Plaintiff's claims to the contrary are baseless, and are belied by the plain language of the Contract.

II.     **The statements contained in Mark Webber's Affidavit lack any foundation.**

Under Federal Rule of Evidence 602, "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602 (2008). Further, in order to opine on a subject involving "specialized knowledge" (such as the industry standards or customs and practices in the freight transportation industry), a witness must rely on his own knowledge, skill, experience, training or education and base such an opinion on sufficient facts or data. See, FED. R. EVID. 702 (2008)

In the "Affidavit of Mark Webber" attached to Plaintiff's Response, Webber contends that "[I]t is standard industry practice for freight managers to include all contract terms in a printed document to be signed by the customer" and "[I]t is not standard industry practice for freight managers to put contract terms on their website." (See, Plaintiff's Response, Ex. 1, ¶¶ 7, 13). In doing so, Webber attempts to opine on the industry standards in the motor carrier transportation industry.

However, Webber's affidavit contains no foundational facts establishing his personal knowledge or ability to opine regarding the "standard industry practice" in the transportation industry. The affidavit merely states that Webber is "employed by MicroMetl Corp....acting in the capacity of General Manager." (Pl.'s Resp., Ex. 1, ¶ 2). The affidavit contains no facts

regarding his duties, training, experience, or education in that capacity, nor does it contain any facts regarding how often Webber encounters contracts similar to the one at issue in the normal course of his work. In short, Plaintiff fails to provide any foundation under Federal Rules of Evidence 602 or 702 to show that Mark Webber has the requisite personal knowledge or skill, experience, training or education to opine on the "standard industry practices" in the transportation industry.

In reality, the "standard industry practice" in the transportation industry is to use a short-form signature page (like the one attached to Plaintiff's Complaint) that references and incorporates the terms and conditions of the contract, which are normally found on the Internet. (See, Second Declaration of Michael Regan, attached hereto as "Exhibit 4"). Indeed, many of the carriers that Plaintiff itself has used in the past utilize a short-form contract referencing specific terms and conditions on their websites. (Ex. 4, ¶¶ 12). Webber's claim that the "standard industry practice" is not to put contract terms on a website represents either a deliberate attempt to mislead this Court or a remarkable ignorance of the actual realities involved in contract formation within the transportation industry.[2] Either way, Webber's statements lack any foundation whatsoever, and should be ignored by this Court.

**III.  Plaintiff fails to sustain its burden demonstrating that the forum selection clause is invalid and that venue is appropriate in Indiana.**

For all its righteous indignation regarding the "fundamentally unfair," "unreasonable," and "unjust" nature of the forum selection clause in this case, Plaintiff fails to cite a single case supporting such conclusory statements. Instead, Plaintiff's argument essentially boils down to, "The forum selection clause is unfair because we never bothered to read it." Plaintiff cites no

---

[2] Indeed, Webber's constant reference to TranzAct as a "freight manager" demonstrates his lack of knowledge of industry terms and practices, as there is no standard industry term of "freight manager," nor has TranzAct ever been referred to as a "freight manager." (Ex. 4, ¶ 6).

6

"fraud or related misconduct" by which the forum selection clause was allegedly procured, and fails to cite any "significant costs on third parties or the judicial system" that might occur if the clause was enforced.  IFC Credit Corporation v. Aliano Brothers Gen. Contractors, Inc., 437 F.3d 606, 610 (7th Cir. 2006); Abbott Laboratories v. Takeda Pharmaceutical Company Ltd., 476 F.3d 421, 423 (7th Cir. 2007); Northwestern National Ins. Co. v. Donovan, 916 F.2d 372, 376 (7th Cir. 1990).  In short, Plaintiff cites nothing, other than its own failure to read a contract that it signed, to dispute the prima facie validity of the forum selection clause.  As such, the validity of the clause should be upheld.

Having failed to undermine the validity of the clause, Plaintiff essentially capitulates on the issue of venue itself.  As Defendant noted in its original Motion, Plaintiff has the burden of proving that the chosen venue is proper when venue is challenged under Rule 12(b)(3).  Estate of Moore v. Dixon, 460 F. Supp. 2d 931, 935 (E.D. Wis. 2006); Interlease Aviation Investors II (ALOHA) L.L.C. v. Iowa Corp., 262 F. Supp. 2d 898, 913 (N.D. Ill. 2003).  Here, however, Plaintiff makes no attempt to show that Indiana is a more appropriate or even convenient venue than Illinois.  Indeed, Plaintiff even admits that "litigating this dispute in Chicago is no more burdensome or inconvenient to MicroMetl than litigating in Indianapolic is to TranzAct."  Faced with a prima facie valid forum selection clause, Defendant cannot point to a single compelling reason that this case should remain in Indiana.  As such, Plaintiff has failed to sustain its burden with regard to both the clause itself and its chosen venue, and the Defendant's Motion to Dismiss/Transfer should be granted.

Case 1:08-cv-03257    Document 21    Filed 04/21/2008    Page 8 of 9

Respectfully Submitted,

TRANZACT TECHNOLOGIES, INC.

By: /s/ Ryan A. Mahoney
One of Its Attorneys

Thomas E. Schulte
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY
10 West Market Street
Suite 1500
Indianapolis, IN 46204
(317) 492-9274 ph
(317) 687-2414 fax

and

Daniel C. Sullivan (*pro hac vice*)
Ryan A. Mahoney (*pro hac vice*)
SULLIVAN, HICKS & CONWAY
120 West 22nd Street, Ste. 100
Oak Brook, IL 60523
(630) 573-5021 ph
(630) 573-5130 fax

ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 21st day of April, 2008, a copy of the foregoing was filed electronically. The following parties may access this filing through the Court's ECF system:

Thomas E. Schulte
tschulte@scopelitis.com

Douglas Robert Brown
dbrown@silegal.com

Thomas W. Blessing
tblessing@silegal.com, dedmondson@silegal.com

                                              /s/ Ryan A. Mahoney
                                              Ryan A. Mahoney


SULLIVAN, HICKS & CONWAY
120 West 22nd Street, Ste. 100
Oak Brook, IL 60523
(630) 573-5021 ph
(630) 573-5130 fax

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICROMETL CORP., <br> Plaintiff. | | Case No.: 1:08-cv-0321-LJM-WTL |
| vs. | | U.S. District Judge Larry J. McKinney |
| TRANZACT TECHNOLOGIES, INC., <br> Defendant. | | Magistrate Judge William T. Lawrence |

### DECLARATION OF MICHAEL A. REGAN

I, MICHAEL A. REGAN, pursuant to 28 USC § 1746, do hereby declare under penalty of perjury that the following statement is true and correct and if called upon to testify, my testimony would be as follows:

1. I am of legal age and under no legal disability to testify in the above-captioned proceeding, and the following declarations are made upon my own personal knowledge.

2. I am the CEO of TranzAct Technologies, Inc. d/b/a "Freedom Logistics®" ("TranzAct") and, in that capacity, I am authorized to submit this Declaration on behalf of Tranzact.

3. I have read and familiarized myself with the affidavit of Mark Webber as well as MicroMetl's response to TranzAct's Motion to Dismiss/Transfer for Improper Venue.

4. I have been involved with transportation and, more specifically, motor carrier transportation (the mode of transportation involved with this lawsuit), as my principal occupation for more than twenty-five (25) years.

5. I co-founded TranzAct in 1984, and acquired the majority interest in TranzAct in 1989 . I have acted as the Chief Executive Officer since then.

**EXHIBIT 4**

6. Neither I nor my business has ever operated as a "freight manager." In the more than 24 years that I have been associated with TranzAct, I have never heard of TranzAct or any other third party logistics (3PL) company referred to as a "freight manager". In fact, I have never heard this term used to describe any business in the motor carrier transportation industry.

7. While TranzAct has a broker license issued by the Federal Motor Carrier Safety Administration, TranzAct does not act as a broker as that term is generally understood in the motor carrier transportation industry. TranzAct's Freedom Logistics® business division doesn't buy or sell transportation, and it doesn't arrange Less-Than-Truckload ("LTL") transportation. TranzAct establishes a defined marketplace that shippers can use consisting of motor carriers that Tranzact has prequalified to standardize shipping terms. TranzAct negotiates rates with these selected carriers and then marks up the rates to compensate for its negotiation services.

8. TranzAct's customers can elect to use the carriers in its network or other carriers as they so choose. TranzAct's customers retain liability for paying their freight charges and at all times can call and deal with such carriers directly. TranzAct never assumes liability for the transportation, including the terms for transportation, and the actual contracts for transportation are between TranzAct's customers and the Freedom carriers or other carriers selected by TranzAct's customers.

9. In addition to providing the defined marketplace of prequalified carriers known as the Freedom Logistics Network®, TranzAct provides freight bill processing, auditing, freight bill payment, preparation of reports, and related services.

10. TranzAct's work for MicroMetl involved giving them access to the Freedom Carrier Network, auditing and paying their bills, providing reports and providing access to our on-line

rating engine. MicroMetl exercised the sole responsibility for the selection of the transportation terms and the motor carriers to be used.

11. In my more than 25 years experience in the motor carrier transportation industry, all of the terms of transportation for a motor carrier (or even other transportation entities – e.g., rail or ocean carriers) are very complex, but all shipments move over a single page document: a bill of lading. Every single page bill of lading adopts by reference the contract terms and rules that govern each bill of lading shipment contract.

12. In my experience, over the past five or so years, a great number of motor carriers have posted the contract terms and rules that govern shipment contracts (also known as "tariff rules") on the Internet, and then incorporated them by reference on the bill of lading. Examples of this common industry practice (a.k.a posting rules on the Internet) can be found at the following websites:

http://www.aaacoooper.com/downloads/RulesTariff.pdf;

http://myyellow.com/dynamic/services/content/serviceguide/rules_conditions/index.jsp;

http://abfs.com/resource/guide/Default.asp?bhcp=1;

http://estes-express.com/tools/forms/rules.pdf

http://www.roadway.com/shipment_resources/

http://www.conway.com/en/tools_pricing/freight/rate_quote/expressrate/expressrate_archive

13. In addition, it has become common for brokers and other transportation intermediaries to post their terms, conditions and rules on the Internet. These terms, conditions and rules are all then adopted by reference in rate confirmations, dispatch confirmations, e-mail confirmations, and various other "short-form contracts" regarding transportation that is

3

purchased and sold or arranged by brokers by telephone, fax and e-mail. Some examples of information disclosed on the sites of brokers includes:

https://ecomm.twinmodal.com/EcommerceWebClient/VendorPackagePdf/VendorPackage.pdf1

http://www.tuckerco.com/company/documents_forms.shtml

14. It has become a common industry practice that most transportation contracts have a short form document -- such as a bill of lading, rate confirmation, or dispatch confirmation -- that references another document that controls all but the most basic terms. In my experience, my company has reviewed hundreds of such short-form contracts.

15. Consistent with this common industry practice, TranzAct has for at least the past five years, posted and made available electronically on the Internet the standard principles governing its Freedom Logistics® program. TranzAct has maintained this web site for over 5 years containing all of our service offerings and the rules, terms and conditions governing our service. Inasmuch as TranzAct's standard principles provide the company with a competitive advantage, these principles are available only to our customers. We do not distribute these principles to our competitors; we advise our customers that an access PIN is available upon request.

16. I personally met with Mark Webber of MicroMetl at his place of business. I explained TranzAct's services, and, as I do with all of our customers, I would also have mentioned that standard principles governing our relationship with MicroMetl were available upon request. In fact, these principles were available on the Internet when MicroMetl executed the contract in 2003. Since that time, the principles governing TransAct's relationship with MicroMetl were not altered.

17. At no point, prior to November 2007, did MicroMetl ever request access to TranzAct's standard principles and never once raised the issue of being able to access the principles.

18. When we did business with Mr. Webber, much of that business was done electronically so I know MicroMetl has the ability to use the Internet, and MicroMetl could have accessed these standard principles that govern our relationship with all of our customers.

19. When Mark Webber signed the short form document, the document contained specific language incorporating the online standard principles. MicroMetl must have known that the short form document did not contain all of the terms governing our relationship because there was no way the parties could effectively conduct any business based on the limited terms contained in the short form.

20. TranzAct administers the Freedom Logistics Network® on behalf of a number of shippers and carriers spread throughout the United States and the need for commonly applicable standard principles was one of the reasons I insisted that the terms of TranzAct's relationships with its customer would be centrally available at TranzAct's website. Further, I insisted upon the forum selection clause contained in TranzAct's standard principles so that a singular venue and accompanying body of law would govern any issues that arose under the contract.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 17 of April, 2008:

_____
Michael Regan